UNITED STATES DISTRICT COURT

_____ **WESTERN** _____ DISTRICT OF _____ **TENNESSEE** _____

UNITED STATES OF AMERICA

V.

**CRIMINAL COMPLAINT**

CASE NUMBER:

**EDMUND H. FORD,**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From at least on or about August 30, 2006, through at least on or about October 27, 2006 in Shelby county, in the Western District of Tennessee defendant(s) did, (Track Statutory Language of Offense)

as a public official, obtain payments to which he was not entitled, knowing that the payments were made in return for official acts, which conduct affected interstate commerce,

in violation of Title 18 United States Code, Section(s) 1951(a). I further state that I am a(n) Federal Bureau of Investigation Special Agent Daniel A. Netemeyer and that this complaint is based on the following facts:

**SEE AFFIDAVIT**

Continued on the attached sheet and made a part hereof.  ✓ Yes / No

_____
Signature of Complainant

Sworn to before me, and subscribed in my presence

Nov. 29, 2006
Date

at    Memphis, Tennessee
City and State

Jon P. McCalla, U.S. District Judge
Name and Title of Judicial Officer

s/ Jon P. McCalla
Signature of Judicial Officer

# AFFIDAVIT

## I.

## INTRODUCTION

I, Daniel A. Netemeyer, being duly sworn, state that the following information is true and correct to the best of my knowledge, information and belief:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice. I have been so employed by the FBI for the past 10 years. Before that, I was a police officer with the City of Collinsville, Illinois for 8 years. I am currently assigned to the Memphis Division of the FBI on squad 3, assigned to Public Corruption investigations. I am one of the agents participating in the investigation described in this affidavit.

2. Because this is an ongoing investigation and as a precaution to assure the safety of agents and officers involved in executing arrest warrants in this matter, we ask that this complaint and affidavit be **filed under seal** so that the target is not prematurely alerted to the existence of this investigation and/or the scope and direction of the investigation.

3. I have participated in this investigation, and I have received information about matters relevant to this investigation from, among other sources, conversations with and reports by other Special Agents of the Federal Bureau of Investigation ("FBI"), Special Agents and Task Force Officers ("TFOs") of the Drug Enforcement Administration ("DEA"), and Officers of the Shelby County Sheriff's Office. The statements contained in this affidavit are based in part on information provided by other investigators assigned to this case, on information provided by named and confidential sources, on information contained in records obtained by the investigators and summaries of records and reports prepared by investigators, and on my own experience and background. I am familiar with the information contained in this affidavit, and

on the basis of this familiarity, and on the basis of other information, which I have reviewed and determined to be reliable, I allege the facts contained herein.

4. Since this affidavit is being submitted for the limited purpose of filing a complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation in order to establish probable cause for the complaint. This affidavit is incorporated by reference in the complaint.

## II.

## THE VIOLATION CHARGED IN THE COMPLAINT

5. The complaint charges a violation of 18 U.S.C. § 1951(a) based on the receipt of cash bribes by defendant Edmund H. Ford ("Ford"). Section 1951 provides in relevant part that:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both. ....(b)(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or *under color of official right*..

[emphasis added]

6. Your affiant has been advised by the United States Attorney's Office for the Western District of Tennessee that establishing a violation of section 1951(a) requires proof that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts. *Evans v. United States*, 504 U.S. 255, 268 (1992). The government must also show an effect on interstate commerce.

2

7. As discussed below, the investigators have obtained evidence that: Ford is a Memphis City Councilman; Ford received several cash payments; and the cash payments were for Ford's assistance, as a Memphis City Councilman, in securing the Memphis City Council's approval of a planned development which would include a billboard near Interstate 240 (a means of traveling in interstate commerce), and in securing the ultimate repeal of a moratorium on billboards.

## III.

## THE DEFENDANT

8. Edmund Ford was elected to the City Council in October 1999. He is the District 6 representative, and he served as Chairman in 2005. He operates the E. H. Ford Mortuary at 3390 Elvis Presley Blvd, Memphis, Tennessee.

## IV.

## OVERVIEW OF THE INVESTIGATION

9. In the Summer of 2006, agents with the FBI and DEA contacted an individual ("CW-1") and advised him that he was facing federal criminal charges.[1] CW-1 agreed to cooperate with the agents with the hope that this cooperation will be taken into account in the disposition of the pending federal case against CW-1.

10. CW-1 told the agents that he represented clients before the Memphis City Council. CW-1 told the agents that Ford regularly supported proposals backed by CW-1. CW-1 also described favors he had performed for Ford, including assisting in Ford's acquisition of a Cadillac with financing in the name of a third person, although Ford was responsible for making

---

[1] Your affiant will orally advise the Court as to the identity of CW-1.

the payments. In addition, CW-1 assisted Ford in obtaining a loan to remodel his mortuary.

11. CW-1 also advised that he represented a client in connection with a pending proposal that would be coming before the City Council which involved approval for a real estate development and a billboard alongside Interstate 240. Acting under the agents' supervision, and while equipped with recording devices,[2] CW-1 proceeded to make the following cash payments to Ford so that Ford could make payments on the Cadillac and to secure Ford's support for the billboard project and assistance in securing the votes of other Memphis City Council members for the project:

> On August 30, 2006, CW-1 paid $3,000 to Ford.
>
> On October 2, 2006, CW-1 paid $1,900 to Ford.

12. On October 3, 2006, the Memphis City Council voted in favor of the project. Ford voted for the project, and he later told CW-1 that he had spoken to the other Councilmen to promote the project.

13. In addition, on October 27, 2006, CW-1 paid $2,000 to Ford to secure his assistance in obtaining the ultimate repeal of a moratorium on billboards.

---

[2] I was the agent who was primarily responsible for supervising CW-1 during the undercover operation. Throughout this affidavit, I refer to consensually recorded conversations involving CW-1. The summaries and quotations regarding these communications reflect the investigators' current interpretations of the conversations which may change as new information is developed and recorded conversations are re-examined.

4

V.

## THE UNDERCOVER INVESTIGATION OF COUNCILMAN FORD AND THE PAYMENTS TO FORD FOR HIS ASSISTANCE CONCERNING BILLBOARD ISSUES

14. At the time CW-1 was initially questioned by the agents, CW-1 said he was representing a client who was seeking approval for a development near Interstate 240 which would include a billboard. According to CW-1, the project was likely to be rejected by the Land Use Control Board and the Office of Planning and Development (OPD) and that recommendation would then be reviewed by the City Council.

15. CW-1 also told the agents about his ongoing relationship with Ford. Ford regularly supported proposals backed by CW-1. CW-1 said that approximately four years ago Ford approached him for assistance in securing a loan to relocate his mortuary. CW-1 assisted Ford in obtaining the financing. CW-1 also arranged financing for Ford's lease of a Cadillac. The lease was in the name of a third person, and Ford had fallen behind in the payments.

16. As discussed below, under the agents' supervision, CW-1 met with Ford and made two payments to him so he could make the car payments. The payments were in exchange for Ford's assistance in securing approval of the billboard project. Audio and video recordings were made of the meetings described below.

17. On August 28, 2006, CW-1 went to Ford at Ford's mortuary, E. H. Ford Mortuary at 3390 Elvis Presley Blvd, Memphis, Tennessee. Ford was not there, but CW-1 spoke to Ford by telephone while CW-1 was at the mortuary. CW-1 told Ford that he had to see him about a

"case"; that "it's one of those things with a double rejection;[3] and that "I need some help with some of the others."[4]

18. On August 30, 2006, CW-1 met Ford at Ford's mortuary. CW-1 gave Ford $3,000 in cash folded in the invoice for the car payment.[5] At the beginning of the meeting, CW-1 brought up the subject of the delinquent car payments. CW-1 also put the cash folded in the invoice on the table. Ford was videoed as he looked at the money in the envelope and put it back on the table. CW-1 told Ford that there was enough to make the payments for July, August and September. CW-1 then began to discuss the billboard project pending before the City Council. CW-1 said that "staff" [referring to the Land Use Control Board] and "OPD" [the Office of Planning and Development] had rejected the project. Ford began to discuss which Councilmen were likely to vote in favor of the project, and he suggested that CW-1 talk to two of the Councilmen himself. Ford, after discussing the likely votes by the Councilmen, assured CW-1 that "you're fine, you're good to go." CW-1 also told Ford about a recent Attorney General's opinion that the billboard ordinances were unconstitutional and asked Ford to approach the City Attorney on this issue. Ford responded, "I'll talk to her." At the end of the meeting, Ford was videoed as he took the folded invoice containing the money off the table, quickly looked around and put the money in his pocket. As he did this, he talked about lining up the votes for the billboard project. As he put the money in his pocket, Ford said that, other than the two

---

[3] CW-1 was referring to recommendations by both the Land Use Control Board and the Office of Planning and Development (OPD) that the project not be approved.

[4] The recording device worn by CW-1 recorded CW-1's side of this conversation.

[5] Before the meeting, I folded the cash ($3,000 of FBI funds) into the invoice and then stapled it and gave it to CW-1.

6

Councilmen CW-1 needed to talk to, "I can handle the rest of it, I can handle all of that for you."

19. On September 16, 2006, CW-1 called Ford. The call was recorded. CW-1 told Ford that the "case" [the billboard project] would not be on the City Council agenda for two more weeks. CW-1 asked Ford if he had talked to the City Attorney. Ford replied that he had not but asked CW-1 to remind him to call the City Attorney.

20. On October 2, 2006, CW-1 again met Ford at Ford's mortuary. The video recording shows that CW-1 showed Ford a diagram of the site of the billboard project, and Ford agreed to speak in favor of the project if this was needed. After additional discussion, Ford promised not to forget to promote the project with the other City Councilmen, and as he said this, he was videoed as he put CW-1's diagram in his pocket. Immediately after this, CW-1 asked if Ford made the car payments; Ford said "yeah"; and CW-1 said he would give Ford money for a couple of more payments. The video recording shows the following occurred next:

- CW-1 counted $1900 on the table;[6]
- As CW-1 counted, Ford talked about lining up the votes;
- CW-1 pushed the money across the table to Ford and asked him to be sure not to get too busy to forget to push the project;
- Ford took the money; and
- As he put in his pocket, Ford said "I'll drum up seven or make somebody walk out."

Ford continued to discuss the likely vote on the project as he and CW-1 walked out of the

---

[6] Before the meeting, I provided this cash to CW-1. I provided $2,000 in FBI funds. After the meeting, CW-1 told me that he had inadvertently left $100 of this money in his pocket while counting out the payment to Ford, and CW-1 gave the $100 to me.

7

mortuary. Ford assured CW-1 that "I'll make certain" to have the right number of votes. Ford also promised to talk to the City Attorney the next day.

21. On October 3, 2006, before the City Council meeting, CW-1 went to Ford's office in the Memphis City Hall. Ford told CW-1 "you'll be fine. I don't see no problem." Ford also counted the likely votes aloud.

22. During the City Council meeting later on October 3, Ford voted in favor of the project. The Council voted in favor of the project by a 9 to 2 vote, overturning the recommendations of the Land Use Control Board and the Office of Planning and Development (OPD) which had recommended against the proposal.

23. On October 27, 2006, CW-1 again met Ford at Ford's mortuary. As Ford greeted CW-1, Ford commented on the successful vote on the billboard project: "your thing worked out good, didn't it?" Ford also said that it was not difficult to get this result: "everyone knows how good you've been to them. Really, I didn't have too much of a problem." CW-1 then discussed with Ford what information and documents CW-1 needed to assist Ford in obtaining financing for the purchase of the building housing E. H. Ford Mortuary. CW-1 then discussed the plan to repeal the billboard moratorium. CW-1 asked Ford to meet with the City Attorney and said he would provide Ford with a copy of the Attorney General's opinion on the unconstitutionality of the billboard ordinance. CW-1 said, "once you get her [the City Attorney] briefed on it, I need you to round up the votes, if you can please, to get that part repealed." In response, Ford said "okay", commented that the ordinance was unconstitutional and said "I'll get on that for you." The video recording shows the following occurred next:

- CW-1 put a roll of cash on the table and said, "Let me tell you what I'm

8

    going to do. Because this is a priority with me. Now look here. Take this. Here's two.[7] And knock this down. Now you'll only need $4,800. Okay? For your mortgage thing."

- Then CW-1 said, "Once you make a little headway with that"; then Ford said, I'll get on that"; then CW-1 said, "I'll get some more and uh"; and then Ford said, "I'll get on that today."

- Ford then took the money, tapped it on the table and folded it into a sheet of paper.

Ford and CW-1 then talked about the vote on the billboard project during the October 3 Council meeting. Ford said, "I went to them all and they were fine." At the end of the conversation, CW-1 said that he would send the Attorney General's opinion to Ford and asked Ford to contact the City Attorney the following week.

    24.    On November 6, 2006, CW-1 again met Ford at Ford's mortuary, and Ford again promised to contact the City Attorney. Ford asked CW-1 to call him back, and CW-1 told Ford that he "will try to have some more stuff for you" [referring to another payment].

## VI.

## CONCLUSION

    25.    Based on your Affiant's experience, training, and the foregoing observations and facts, your Affiant believes that there is probable cause to believe that Edmund H. Ford, a public official, has obtained payments to which he was not entitled, knowing that the payments were made in return for official acts, and that this conduct affected interstate commerce, in violation of

---

[7] This refers to the $2,000 in cash (FBI funds) I provided to CW-1 before the meeting.

18 U.S.C. § 1951(a).

                                              Daniel A. Netemeyer
                                              Special Agent
                                              Federal Bureau of Investigation

Sworn to and subscribed before
me this __29__ th day of November, 2006,

s/Jon P. McCalla
THE HONORABLE JON PHIPPS McCALLA
UNITED STATES DISTRICT COURT JUDGE